## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## ELKINS

**UNITED STATES OF AMERICA,**

        Plaintiff,

**v.**                                        **Case No.:  2:17-CR-14-8**
                                            **(JUDGE BAILEY)**

**CARLA DENISE JONES,**

        Defendant.

## REPORT AND RECOMMENDATION

### I.   Introduction

Defendant Carla Denise Jones was indicted by a grand jury attending the United States District Court for the Northern District of West Virginia on September 6, 2017, charging her with conspiracy to possess stolen firearms, possession of stolen firearm-aiding and abetting, and unlawful possession of a firearm.  Defendant was subsequently arraigned and released on certain conditions pending trial.

On January 16, 2018, Defendant Carla Denise Jones, by and through her counsel, Robert E. Barrat, filed a motion to suppress statements Defendant made during the execution of a search warrant of her home on February 2, 2017.  (ECF No. 267).  On the same date, the United States Attorney through Assistant United States Attorney, Stephen D. Warner, filed a response to Defendant's motion. (ECF No. 269).

On January 26, 2018, the parties appeared before the undersigned for a hearing on Defendant's motion to suppress.  Both parties filed supplemental memoranda in support of their positions on February 2, 2018.  (ECF Nos. 313, 314).

**Statement of Facts**

During the January 26, 2018, suppression hearing, the sworn testimony of Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent Steve Worthy, Resident Agent in Charge (RAC) Dewayne Haddix, and Special Agent Heather Kozik was received along with Defendant Exhibit 1 (a copy of the Advice of Right and Waiver form for co-defendant Aaron McClain), Government Exhibit 1, (a copy of the Consent to Search form signed by Defendant), Government Exhibit 2 ( a copy of the Report of Investigation by Steve Worthy), and Government Exhibit 3 (a copy of the search warrant, attachments A and B, and affidavit of  Special Agent Worthy, which was used to obtain the search warrant used to search Defendant's home).  Finding the testimony of the Government witnesses credible, the undersigned deduced the following facts after considering the parties' motions and responses and all the evidence and testimony that was provided to the Court during the suppression hearing.

On the morning of February 2, 2017, authorities executed a search warrant to search Defendant's residence for stolen firearms.  The authorities arrived in six large vehicles comprised of thirteen armed officers in two teams; one team to secure the premises and another to search the Defendant's home.  Upon exiting their vehicles, the authorities who were wearing vests and carrying rifles, approached the home with their rifles drawn.  Agent Gregory Perry knocked on the door.  Shortly thereafter, while still in her nightgown, Defendant opened the door and was directed by Agent Perry to exit the residence so officers could execute the search warrant.  Defendant complied.  Officers entered the home and announced their presence loud enough for someone at the rear of the home to be aware of their presence.  Within approximately fifteen minutes the

house was confirmed to be clear of any other occupants. Thereafter, the agents holstered their weapons and returned their vests and rifles to their vehicles. Defendant was permitted back into the residence but was accompanied by an officer while in the home.[1] Officer Kazi (a female ATF agent) escorted Defendant to her bedroom and then into the bathroom while Defendant changed her clothes and then "handed [Defendant] off" to another officer who escorted her to the porch at the rear of the house where the interview in question took place. Both Defendant and co-Defendant McLain (Defendant's boyfriend and co-occupant of the home) were required to remain on the rear porch. After a period of time, McLain was taken to another room where he was Mirandized and questioned. During the execution of the search warrant, neither Defendant nor co-defendant McLain were allowed to wonder freely about the home without police supervision, apart from using the restroom after the restroom had been searched.

    The Defendant remained on the rear porch for several hours with RAC Haddix while the authorities completed their search, during which drug paraphernalia was found. RAC Haddix testified that he and Defendant conversed while on the porch. He further testified that in accordance with standard operating procedure, he believed he told Defendant Jones that she "was free to leave" and "not under arrest" but "if she chose to stay that they [the officers] would like to talk to her." Defendant admitted, in her "Motion to Suppress" that the officers told her that "she was free to go to do what she wanted" (ECF N0. 267 at 2). RAC Haddix stated that the conversation was amicable and involved a discussion of Defendant's businesses and general small talk. Later,

---

[1] It is unclear to the undersigned where co-defendant McLain was being held while Defendant was being held on the front portch.

Special Agent Worthy joined them on the porch and the conversation became "more formal." At some point during the conversation, whether during small talk or the more formal interview, Defendant was asked to sign a "Consent to Search" another building and garage located on Defendant's property. See Government Exhibit 1 (ECF No. 291-1). Among other things, the consent form informed Defendant of her right to refuse to give consent to the search, her right to consult with an attorney prior to the search, and her right to withdraw consent with respect to the search. The Government concedes that at no point in time was Defendant Mirandized. However, she was questioned about her drug usage and made incriminating statements thereto.

### Contention of the Parties

In her motion, Defendant seeks an order from the Court suppressing statements she made to law enforcement on February 2, 2017, arguing the officers failed to administer the required Miranda warning prior to interrogating Defendant. Defendant asserts that on that date, officers rushed into her home, yelled and screamed at her and co-defendant Aaron McLain. (ECF No. 267 at 1). Officers were armed with shotguns, handguns, helmets and shields. Id. Officers repeatedly questioned her and called her a liar, and questioned her and co-defendant McLain both together and separately. Id. at 1, 2. Defendant further stated that the officers told her "she was free to go to do what she wanted," but accompanied her at all times and restricted her movements to her home. Id. at 2.

In response, the Government contends Defendant was never in custody, and although she was followed while inside her home, the purpose for doing so was to "protect the integrity of the search warrant execution." ECF No. 269 at 1. The

4

Government further noted that Defendant signed a consent to search her business property where she was advised of her right to consult with an attorney.  Id.  At the January 26, 2018, suppression hearing, the Government asserted that when RAC Haddix and Defendant conversed, Defendant Jones was not a suspect in the crime and was considered to be only a witness in the investigation. It was not until Defendant Jones subsequently provided false information to Special Agents that the Government then considered her a suspect in the investigation.

## Discussion

The United States Constitution guarantees that "[n]o person. . . shall be compelled in any criminal case to be a witness against himself."   U.S. Const. amend. V.  To safeguard the privilege against self-incrimination, the Supreme Court established that law enforcement officers must inform individuals that are subject to custodial interrogation of their "right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney."  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  Absent a Miranda warning, statements obtained from an individual subject to custodial interrogation may not be used against the individual. Id.; see also, United States v. Hargrove, 625 F.3d 170, 177 (4th Cir. 2010).   The relevant question here is whether Defendant was in custody for Miranda purposes during the interview at her home.

The test for determining whether an individual is "in custody" for Miranda purposes is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'"  Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)

(per curiam)).  The Court's analysis of the circumstances must be an objective one, and must ask whether "'a reasonable man in the suspect's position would have understood his situation' to be one of custody." United States v. Colonna, 511 F.3d 431, 435 (4th Cir. 2007).  Stated differently, the court must consider whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." United States v. Hashime, 734 F.3d 278, 282 (2013) (quoting United States v. Jamison, 509 F.3d 623, 628 (4th Cir. 2007) (alteration in original) (quoting Thompson v. Keohane, 516 U.S. 99, 112, 116 (1995)) (internal quotation marks omitted).

Facts considered when determining whether a defendant not formally arrested was in fact in custody, include, but are not limited to "'the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant'". Hashime, 734 F.3d at 283 (quoting United States v. Day, 591 F.3d 679, 696 (4th Cir 2010) (citation omitted).  Physical restrictions placed on the suspect and isolation and separation from their family are also pertinent. Id.  (citation omitted).

Here, law enforcement initially dominated the scene with thirteen agents descending upon Defendant's property with guns drawn, eight to nine who entered her home with guns drawn and raised voices.  This initial action however was short lived and necessary considering the focus of the search was for the search of guns.  The agents returned their shields and rifles to their vehicles following the initial fifteen-minute safety sweep, and while the agents continued to possess holstered hand guns, this would be common and expected during the execution of a search warrant to its

6

completion.  Furthermore, the agents had the authority to secure the home and temporarily detain Defendant and co-defendant McLain in order to secure the premises for conducting the search pursuant to the search warrant.  See Hargrove, 625 F.3d at 179 (finding agents were authorized to secure the premises and that a custodial level of control did not extend beyond the initial entry by the search team).  Here, a custodial level of control did not extend beyond the initial entry of the search team and consequently, the agents' actions did not place Defendant "in custody" when she was interviewed by RAC Haddix.

Generally courts are less likely to characterize interrogations occurring in familiar settings, like a person's home, as custodial. See e.g., Oregon v. Elstad, 470 U.S. 298, 315 (1985) (finding interview that took place in suspects living room while his mother was in the kitchen was not a coercive environment; Hargrove, 62 F.3d at 180-81 (finding interviewing suspect at his kitchen table was a "comfortable atmosphere" and suspect was not "in custody"). Here, Defendant was questioned in her home and the conversation between Defendant and RAC Haddix was amicable, non-threatening, and not coercive.  As such, the setting here is not of the degree associated with formal arrests and supports finding Defendant was not in custody.  Additionally, courts find isolation and separation from family may support being "in custody," here, though accompanied by law enforcement, Defendant was permitted to be with co-defendant McLain while the agents completed the search.

The Court notes that to the extent that RAC Haddix told Defendant that she was not under arrest and was free to leave, that by itself does not make the interrogation non-custodial.  See Hargrove, 625 F.3d at 180 (4th Cir. 2010) (explaining, that a

statement that the individual being interrogated is free to leave may be "highly probative of whether, in the totality of the circumstances, a reasonable person would have reason to believe he was 'in custody,'" the statement "is not 'talismanic' or sufficient in and of itself to show a lack of custody"). Moreover, while Defendant was cooperative and perhaps chatty, Defendant's demeanor is not dispositive to the custodial inquiry. As underscored by the Supreme Court and the Fourth Circuit, custody determinations depend on the objective circumstances of the interrogation and not on the subjective views of either the interrogating officer or the person being questioned. J.D.B. v. North Carolina, 564 U.S. 261, 287, 131 S. Ct. 2394, 2412, 180 L. Ed. 2d 310 (U.S. 2011); United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001). Conversely, the agents' conduct is a factor to be considered when determining whether a reasonable person would have felt free to leave. Here, RAC Haddix and others aimed "to put [Defendant] at ease," tried to "calm things" upon arrival, and shared pizza with Defendant and McLain, all of which support a finding that Defendant was not "in custody".

Lastly, in regard to "physical contact," there is no suggestion by Defendant or law enforcement that Defendant was handcuffed, physically restrained, or treated in an abusive matter. The Court acknowledges that Defendant's movements were limited; as she was accompanied by an agent during the majority of the time the agents were present for the search. Yet, the totality of the circumstances supports finding that a reasonable person in Defendant's position would not have understood that he or she was "in custody," and that while her freedom of action was limited, the restrictions were justified and necessary so as not to interfere with the legitimate execution of the search warrant issued on the home and were not to a degree consistent with formal arrest.

## **Recommendation**

For the foregoing reasons, the undersigned finds that Defendant was not in custody for the purposes of Miranda. Therefore, the undersigned recommends Defendant's Motion to Suppress (ECF No. 267) be **DENIED**.

Any party may within fourteen (14) days after being served with a copy of this Report and Recommendation file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

Clerk is directed to transmit copies of this Report and Recommendation to counsel of record.

Respectfully submitted this 20th day of March 2018.

_____
MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE